[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**October 20, 2003**
**THOMAS K. KAHN**
**CLERK**

No. 02-15103

D. C. Docket No. 01-00091 CV-2

ROBERT P. AMOS,
ELLEN D. AMOS,
GEORGE E. CASHIN, et al.,

Plaintiffs-Appellants-
Cross-Appellees,

versus

GLYNN COUNTY BOARD OF TAX ASSESSORS,

Defendant-Appellee-
Cross-Appellant,

GLYNN COUNTY BOARD OF EDUCATION,
CITY COMMISSION OF THE CITY OF BRUNSWICK,
in Their Official Capacities,

Defendants-Appellees,

GLYNN COUNTY BOARD OF EQUALIZATION,
GLYNN COUNTY TAX COMMISSIONER, et al.,

Defendants-Appellees-
Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

**(October 20, 2003)**

Before BARKETT and MARCUS, Circuit Judges, and MILLS[*], District Judge.

MARCUS, Circuit Judge:

Appellants Robert and Ellen Amos, along with seventeen other Glynn County property owners,[1] have taken this interlocutory appeal from the district court's order denying their motions for class certification and preliminary injunction. Appellees, Glynn County Board of Tax Assessors, along with several other Glynn County agencies,[2] in turn, cross-appeal from the district court's denial of their motion to dismiss for lack of subject matter jurisdiction. Because we conclude that the Tax Injunction Act stripped the district court of subject matter

---

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1] The other seventeen property owners are George Cashin, Mary Cashin, Marcia Dewhurst, Kenneth Enney, Elizabeth Enney, Lelan Haller, Jean Helck, Patricia Hinerman, William Jens, Helene Jens, Helen Katz, Billy Moore, Marianne Moore, George Paulding, Jr., Edward Stuart, Margaret Stewart, and Laura Williams.

[2] The other appellees are the Glynn County Board of Equalization, Glynn County Tax Commissioner, Glynn County Board of Commissioners, Glynn County Board of Education, and the City Commission of the City of Brunswick. The Glynn County Board of Education and City Commission of the City of Brunswick have not joined in the cross-appeal.

jurisdiction over this lawsuit, we REVERSE the district court's denial of the appellees' motion to dismiss, VACATE its order denying class certification and preliminary injunction, and REMAND for further proceedings consistent with this opinion.

## I.

The essential background and procedural facts are these. The appellants own residential property on St. Simons Island, an upscale coastal development located in Glynn County, Georgia. This lawsuit arises out of a grievance they have with the way Glynn County assessed their ad valorem property taxes in the year 2000. Glynn County's system for assessing property taxes and adjudicating assessment disputes is complex, and we therefore begin with an overview of that system.

The Glynn County Board of Commissioners, the governing body of the county, appoints the Glynn County Board of Tax Assessors (the "Board"), which is responsible for assessing the county's property taxes. To that end, the Board appoints a Chief Tax Appraiser, whose office conducts the actual assessments. The Board must complete its review of the Chief Tax Appraiser's assessments by June 1 of each year, at which point the Board must notify any taxpayers whose assessments have been changed within five days. See O.C.G.A. § 48-5-302.

A taxpayer who is dissatisfied with the Board's reassessment of his property may appeal through the process set forth in O.C.G.A. § 48-5-311. The first step in that process is to appeal to the Board itself within 30 days of the date of the notice. See O.C.G.A. § 48-5-306(b)(2). The Board has 180 days to decide the appeal. See O.C.G.A. § 48-5-311(e)(3). If the Board fails to decide an appeal within 180 days or decides not to change the taxpayer's assessment, the taxpayer's appeal is automatically forwarded to the Board of Equalization ("BOE"). See id. In addition, if the Board changes the taxpayer's assessment but the taxpayer is still unsatisfied, he may appeal to the BOE by notifying the Board within 21 days of the date the Board sends notice of its decision. See O.C.G.A. § 48-5-311(e)(2)(C).

The BOE is a quasi-judicial entity responsible for adjudicating tax appeals in the county. See O.C.G.A. § 48-5-311. There are two such boards of equalization in Glynn County. Each is composed of three members and has jurisdiction over all property tax appeals involving questions of taxability, valuation, entitlement to homestead exemptions, or uniformity of tax valuation within the county. See O.C.G.A. § 48-5-311(e)(1)(A). Within 15 days of receiving notice of an appeal, the BOE must set a date for a hearing to be held within 20 to 30 days of the date of the notification of the hearing. See O.C.G.A. § 48-5-311(e)(6).

4

Notably, once the Board of Equalization returns its decision, the taxpayer may further appeal to Glynn County Superior Court, where he is entitled to de novo review of all of his claims. See O.C.G.A. § 48-5-311(g)(1), (3). If the issues on appeal are purely legal, the taxpayer is entitled to a bench trial within 40 days of filing his appeal. See O.C.G.A. § 48-5-311(g)(4)(A). If the taxpayer's appeal contains fact questions, he is entitled to a jury trial at the first term following the filing of his appeal. See id. From the Superior Court, the taxpayer may appeal upward through the state court system and eventually petition the United States Supreme Court for certiorari review.

Meanwhile, the Board provides the assessments to the Glynn County Tax Commissioner, an independently elected official, who compiles the assessments into a digest and delivers the digest to the State Revenue Commissioner by August 1 each year for examination and approval. Once the State Revenue Commissioner approves the digest, Glynn County is permitted to send out tax bills for the year. Any taxpayer who is in the process of appealing his assessment when the tax bills are sent out is only required to pay 85% of his assessed value and is entitled to a full refund with interest should his actual property tax turn out to be less than he paid. See O.C.G.A. § 48-5-311(e)(6)(D)(iii).

Unfortunately, Glynn County's entire tax assessment scheme has not been working well for close to a decade. In theory, all real property in the county should be reassessed at market value every year. But in practice, the Board has not performed a county-wide reassessment since 1995. In the interim, the Board has reassessed certain properties in the county several times, while neglecting to reassess other properties at all. According to the Board, the properties that are reassessed are chosen based on a "sales price ratio study." The study collects sale prices for recently sold properties in the county and compares the sale prices to the former assessment values of the property. The Board uses this information to determine which neighborhood's properties have market values that are most out of line with their assessed values and selects these neighborhoods for reassessment. In 2000, the Board used this method to pick 3,855 properties for reappraisal out of 37,000 eligible residential properties in the county. The appellants' properties were among the 3,855 properties selected.[3]

Although, from the Board's perspective, the system is designed to promote equality by selecting the most wrongly valued properties for reappraisal, the appellants believe it penalizes them for living in neighborhoods with ever escalating sales prices. They contend that the Board's method unconstitutionally

_____

[3]The appellants are also referred to in this opinion as the "taxpayers."

6

places a disproportionate share of the county tax burden on their shoulders. On May 30, 2001, the appellants filed this class action lawsuit in the United States District Court for the Southern District of Georgia, pursuant to 42 U.S.C. § 1983, claiming that Glynn County's tax scheme violated the Fifth and Fourteenth Amendments to the Constitution by denying them due process and equal protection. As relief, they sought a declaratory judgment and permanent injunctive relief barring the appellees from using the allegedly unconstitutional 2000 tax digest in the collection of ad valorem taxes. Specifically, the plaintiffs say that the Board engaged in "piecemeal or spot reappraisals and reassessments of residential property" without addressing uniformity throughout Glynn County, and returned a non-uniform assessment of real property for the year 2000.

However, this was not the first time that the property owners of St. Simons Island had asked for such an injunction. In Haller v. Glynn County Bd. of Assessors, Case No. 00-01246 (Ga. Super. Ct. 2000), two of the appellants, Haller and Dewhurst, purporting to act on behalf of the same class of property owners, brought suit in Glynn County Superior Court, Georgia, pursuant to 42 U.S.C. § 1983, raising the same federal constitutional challenge and seeking the same injunctive relief barring the Board from applying the 2000 tax digest of Glynn County. The Glynn County Superior Court granted that injunction, restraining

7

appellees from billing or collecting taxes on the parcels of Glynn County real property which were reassessed in 2000 in an amount greater than their 1999 value, but its order was later reversed by the Georgia Supreme Court in Glynn County Bd. of Tax Assessors v. Haller, 543 S.E.2d 699 (Ga. 2001).

The Georgia Supreme Court held that the plaintiffs had an adequate remedy at law with which to challenge the perceived constitutional infirmities in the 2000 tax digest, and specifically that O.C.G.A. § 48-5-311 et seq., provided the plaintiffs with an altogether sufficient mechanism for appellate review of their tax assessments. The Georgia Supreme Court framed its holding in these terms:

> The United States Supreme Court has held that state courts may not award either declaratory or injunctive relief against state taxes under section 1983 when there is an adequate legal remedy. Similarly, we have held that a superior court should not grant an injunction in a tax case when state law provides an adequate remedy at law. O.C.G.A. § 48-5-311 provides a statutory appeals process for taxpayers to challenge a property tax assessment based on the issues of taxability, uniformity, and value. Nothing in the statute prohibits taxpayers from challenging a board's method of conducting spot reassessments as lacking in uniformity, appealing an unfavorable ruling to the county board of equalization, and appealing the equalization board's ruling to the superior court, if necessary. Because O.C.G.A. § 48-5-311 provides the Glynn County taxpayers with an adequate remedy at law, we hold that the trial court erred in granting them injunctive relief.

Id. at 701 (footnotes omitted).

Two months after suffering that defeat, and without petitioning for certiorari review from the United States Supreme Court, appellants Haller and Dewhurst, along with seventeen other St. Simons Island property owners brought this suit in federal district court. The appellees moved to dismiss, arguing that under the Tax Injunction Act of 1937, 28 U.S.C. § 1341, the federal district courts are stripped of jurisdiction and may "not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The appellees also argued, in the alternative, that basic principles of federalism and comity should deter a federal court from interfering with state tax administration where there is an adequate state remedy, especially when the highest court of the state has already held that the state law remedy was in fact adequate.

On August 27, 2001, after conducting extensive evidentiary hearings on the jurisdictional question, the district court denied the motion, concluding that the appeals process provided by O.C.G.A. § 48-5-311[4] is neither plain, speedy, nor

---

[4]The appeals process described in O.C.G.A. § 48-5-311 lays out the entire system of appeals for Georgia's ad valorem property tax system. In addition to the basic features of the system, described supra, the statute fully explains the establishment, composition, responsibilities, and powers of boards of equalization. See O.C.G.A. §§ 48-5-311(a)-(d). It also describes the time frame in which participants (both taxpayers and county officials) must perform their responsibilities under the system. See O.C.G.A. §§ 48-5-311(e)-(g). The statute further lays out the particulars of

efficient, and that accordingly, the Tax Injunction Act did not strip the district court of the power to entertain the suit. The appellees first petitioned this Court, pursuant to 28 U.S.C. § 1292(b), for permission to take an interlocutory appeal from the district court's denial of their motion. We denied their petition on the ground that reviewing the Georgia state remedy to determine whether it was "plain, speedy, and efficient" was too fact-intensive an inquiry for interlocutory review under § 1292(b). See Glynn County Bd. of Tax Assessors v. Amos, No. 01-90048 (11th Cir. Nov. 2, 2001) (order denying petition for interlocutory appeal); Revenue Comm'r of the State of Georgia v. Amos, No. 01-90049 (11th Cir. Nov. 2, 2001) (order denying petition for interlocutory appeal).

The case went back to the district court, which on September 12, 2002, denied the appellants' motion for a preliminary injunction and class certification. The district court concluded that the taxpayers were not entitled to a preliminary injunction because they had failed to show: (1) a substantial likelihood of success on the merits; (2) that the threatened injury to them outweighed the damage the proposed injunction would cause to the appellees; or (3) that if issued, the injunction would not be adverse to the public interest. See Four Seasons Hotels

---

submitting tax disputes to arbitration, and the regulations involved in appealing adverse decisions from a board of equalization to Glynn County Superior Court. See id.

And Resorts, B.V. v. Consorcio Barr, S.A. 320 F.3d 1205, 1210 (11th Cir. 2003) (outlining requirements for issuance of a preliminary injunction). With regard to class certification, the district court held that although the proposed class was sufficiently numerous, the appellants had failed to show that their claims shared "commonality" and "typicality" with the 3,855 taxpayers they sought to represent, and they had not shown they would adequately represent those taxpayers. See Franze v. Equitable Assurance, 296 F.3d 1250, 1253 (11th Cir. 2002) (describing prerequisites to class certification).

In this interlocutory appeal, the taxpayers argue that the district court should have granted the preliminary injunction because the inequality in the tax assessment scheme was inexcusably unjust and violated the United States Constitution, they have been irreparably harmed and the public interest would not be disserved by the entry of injunctive relied. They also contend that the district court wrongly decided important evidentiary issues, which led to an incorrect decision on class certification. The appellees, on the other hand, say that the district court erred as a matter of law by entertaining the taxpayers' claims at all, because the taxpayers had a "plain, speedy, and efficient" remedy under state law

and their suit was therefore barred by the Tax Injunction Act.[5]  As for the merits, appellees say the district court properly denied the preliminary injunction and class certification under Rules 23 and 65 of the Federal Rules of Civil Procedure.

**II.**

The limitation imposed by the Tax Injunction Act is jurisdictional.  See Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1242 (11th Cir. 1991); see also Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 512, 101 S. Ct. 1221, 1228, 67 L. Ed. 2d 464 (1981).  Since "once a federal court determines that it is without subject matter jurisdiction, [it] is powerless to continue," we must always first be sure of our own jurisdiction whenever it is in doubt.  Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999).  We therefore begin with that issue.

When reviewing the district court's denial of a motion to dismiss for lack of subject matter jurisdiction, "we review de novo the district court's interpretation and application of the statutory provisions concerning the court's subject matter

---

[5]Although we originally denied the appellees' petition to review the district court's denial of their motion to dismiss, this Court has an unqualified duty to review the district court's subject matter jurisdiction if the cause of action is before the court on an issue that otherwise qualifies for interlocutory review.  See Tamiami Partners Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla., 177 F.3d 1212, 1221 (11th Cir. 1999).  Since this case is properly before us on interlocutory review, we must decide the question of subject matter jurisdiction.

jurisdiction, and review for clear error the district court's factual findings with respect to jurisdiction." United States v. McPhee, 336 F.3d 1269, 1271 (11th Cir. 2003).

The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Accordingly, we have held that "the Tax Injunction Act will bar the exercise of federal jurisdiction if two conditions are met: (1) the relief requested by the plaintiff will 'enjoin, suspend, or restrain' a state tax assessment and (2) the state affords the plaintiff a 'plain, speedy and efficient remedy.'" Williams v. City of Dothan, 745 F.2d 1406, 1411 (11th Cir. 1984). Here, it is undisputed that the first condition has been met, because this suit plainly seeks to enjoin a state tax assessment. The issue in this case is whether the second condition -- the "plain, speedy, and efficient" remedy -- has also been met.

The Supreme Court has held that "the 'plain, speedy and efficient' exception requires the 'state-court remedy [to meet] certain *procedural* criteria.'" California v. Grace Brethren Church, 457 U.S. 393, 411, 102 S. Ct. 2498, 2509, 73 L. Ed. 2d 93 (1982) (quoting Rosewell, 450 U.S. at 512, 101 S. Ct. at 1229 (emphasis in original)). The touchstone for whether a taxpayer has a "plain,

13

speedy, and efficient" remedy is whether she is entitled to a "full hearing and judicial determination at which she may raise any and all constitutional objections to the tax." Rosewell, 450 U.S. at 514, 101 S. Ct. at 1230 (internal quotation marks and citation omitted). Importantly, "we must construe narrowly the 'plain, speedy, and efficient' exception to the Tax Injunction Act." Grace Brethren, 457 U.S. at 413, 102 S. Ct. at 2510 (emphasis added). As such, the burden rests on the plaintiffs to show facts sufficient to overcome the jurisdictional bar of the Tax Injunction Act. See Smith v. Travis County Educ. District, 968 F.2d 453, 456 (11th Cir. 1992) (holding that the Act applies where the plaintiffs "have not demonstrated that the state courts have refused to entertain their federal claim"); see also Colonial, 921 F.2d at 1246 (discussing whether plaintiff "alleged sufficient facts" to survive summary judgment).

The Supreme Court's stringent interpretation of the exception is well founded. The Tax Injunction Act "was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Rosewell, 450 U.S. at 522, 101 S.Ct. at 1234.

> If federal declaratory relief were available to test state
> tax assessments, state tax administration might be thrown
> into disarray, and taxpayers might escape the ordinary
> procedural requirements imposed by state law. During
> the pendency of the federal suit the collection of revenue

14

> under the challenged law might be obstructed, with
> consequent damage to the State's budget, and perhaps a
> shift to the State of the risk of taxpayer insolvency.
> Moreover, federal constitutional issues are likely to turn
> on questions of state tax law, which, like issues of state
> regulatory law, are more properly heard in the state courts.

Grace Brethren, 457 U.S. at 410, 102 S. Ct. at 2509 (quoting Fair Assessment in Real Estate Assn., Inc. v. McNary, 454 U.S. 100, 109, n.6 (1981) (internal citations and quotation marks omitted)). The Supreme Court "ha[s] long recognized the dangers inherent in disrupting the administration of state tax systems." Id. at 410, n.23, 102 S.Ct. 2509, n.23. "By enacting this jurisdictional rule, Congress gave explicit sanction to the pre-existing federal equity practice: because interference with a State's internal economy is inseparable from a federal action to restrain state taxation, the mere illegality or unconstitutionality of a state . . . tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts." Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 470, 96 S. Ct. 1634, 1640, 48 L. Ed. 2d 96 (1976) (internal quotation marks and citation omitted).

This jurisdictional restraint emerges from "[t]he scrupulous regard [of the federal courts] for the rightful independence of state governments . . . and a proper

15

reluctance to interfere by injunction with their fiscal operations." Matthews v. Rodgers, 284 U.S. 521, 525, 52 S. Ct. 217, 219, 76 L. Ed. 447 (1932). By passing the Act, "Congress sought to end the disruption of local financing resulting from injunction actions in the federal courts. By bringing actions in the federal courts, taxpayers often frustrated the collection efforts of local officials, forcing them to compromise suits and lose tax revenues." Waldron v. Collins, 788 F.2d 736, 737 n.3 (11th Cir. 1986).

Rosewell and Grace Brethren are primary examples of the "reluctance of the federal courts to interfere with the operation of state tax systems if the taxpayer ha[s] available an adequate remedy in the state courts." Grace Brethren, 457 U.S. at 412, 102 S. Ct. at 2510. In Rosewell, the plaintiff owned an apartment complex in Cook County, Ill. "Year after year Cook County require[d the plaintiff] to pay a tax that [was] three times as great as the amount actually due and then, after a 2-year delay, the county refund[ed] the over-assessment without interest." Rosewell, 450 U.S. at 529, 101 S. Ct. 1237 (Stevens, J., dissenting). Much like in the present case, appealing from an appraisal was a process that involved first exhausting an administrative remedy and then appealing to county circuit court. Nevertheless, the Supreme Court held that the state court remedy was "plain, speedy, and efficient" for purposes of the Tax Injunction Act, noting that "[w]hen it passed the

16

Act, Congress knew that state tax systems commonly provided for payment of taxes under protest with subsequent refund as their exclusive remedy." Id. at 523, 101 S. Ct. 1234. The Court explained that the refund procedure, though certainly not ideal, provided the minimum "full hearing and judicial determination" at which constitutional objections to the tax could be raised. Id. at 514, 101 S. Ct. 1230. Further, the plaintiff was able to appeal upward through the Illinois state court system and ultimately petition the United States Supreme Court for certiorari review. As such, the Illinois scheme was found sufficient under the Act.

In Grace Brethren, the Supreme Court reiterated the stringent standard of Rosewell that "[i]n order to . . . be faithful to the congressional intent 'to limit drastically' federal-court interference with state tax systems, we must construe narrowly the 'plain, speedy, and efficient' exception to the Tax Injunction Act." 457 U.S. at 413, 102 S. Ct. at 2510 (emphasis added). In Grace Brethren, the district court had exercised jurisdiction over the merits of a state tax dispute after finding that the possibility of injunctive relief was uncertain under state law and therefore the state remedy was not "plain, speedy, and efficient." See id. at 399-400, 102 S. Ct. at 2503-04. The Supreme Court reversed, holding that since "there is no dispute that [the plaintiffs] in the present case can seek a refund . . . through

17

state administrative and judicial procedures," plainly "the District Court had no jurisdiction to hear the [plaintiffs'] claims." Id. at 413, 415 102 S. Ct. at 2510-11.

Properly, our circuit has taken no more lenient a view of the "plain, speedy, and efficient" exception than the Supreme Court. Explaining that "[s]tate remedies must only meet certain 'minimal procedural criteria,'" we have held that "a reviewing court should eschew any analysis of their substantive sufficiency so long as a complainant has some opportunity to raise his constitutional objections." Colonial, 921 F.2d at 1245 (citation omitted). "[I]t is not required that the state remedy be the best remedy available or even equal to or better than the remedy which might be available in the federal court." Ayers v. Polk County, 697 F.2d 1375, 1377 (11th Cir. 1983) (internal citation and quotation marks omitted). "[T]he applicability of the Tax Injunction Act does not turn on which forum is best able to entertain the action. Rather, the Act bars the exercise of federal jurisdiction whenever the state provides adequate procedures to contest state tax matters." Waldron, 788 F.2d at 738.

In determining whether a state remedy is "plain, speedy, and efficient" under the act, we turn first to the state statutory language. See generally, Colonial, 921 F.2d at 1244 (holding that adequacy of state remedies may turn on amendments to statutory language). Here, to begin with, the face of the statute

18

provides a "plain, speedy, and efficient" remedy. If a taxpayer is unsatisfied with his assessment, he may appeal to the Board, which has 180 days to decide his appeal. See O.C.G.A. § 48-5-311(e)(3). If still unsatisfied, he may then appeal to the BOE, which must promptly schedule a hearing. See O.C.G.A. § 48-5-311(e)(6). "[T]he Supreme Court of Georgia ha[s] consistently held that the board of equalization is the appropriate forum for deciding not only questions of uniformity, valuation, and taxability, but also a taxpayer's questions addressing constitutional and procedural issues." Chatham County Bd. of Assessors v. Jepson, 584 S.E.2d 22, 23 (Ga.Ct.App. 2003) (emphasis added). Once the BOE reaches a conclusion, the taxpayer is entitled to prompt, de novo review in Glynn County Superior Court. See O.C.G.A. § 48-5-311(g)(1), (3). If the issues being reviewed are purely legal, the taxpayer is entitled to a bench trial within 40 days, and if not, to a jury trial at the first term following the filing of his appeal. See O.C.G.A. § 48-5-311(g)(4)(A). He may then appeal upward through the Georgia state system and eventually petition the United States Supreme Court for certiorari review.

The Georgia Supreme Court has already ruled that O.C.G.A. § 48-5-311, the very tax system at issue in this case, "provides the Glynn County taxpayers with an adequate remedy at law." Glynn County, 543 S.E.2d at 701. We can discern

19

no reason to believe that the Georgia Supreme Court's use of the word "adequate" means something different from the "plain, speedy, and efficient" standard at issue before us. Indeed, the Georgia Supreme Court's "adequate legal remedy" language is taken directly from Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n, where the Supreme Court discussed the Tax Injunction Act at length and explained that the same principle behind the Tax Injunction Act also prevents state courts from granting § 1983 relief where an "adequate legal remedy" exists. 515 U.S. 582, 587, 115 S. Ct. 2351, 2355, 132 L. Ed. 2d 509 (1995). Since the principle behind the Tax Injunction Act and Nat'l Private Truck Council is identical -- limiting federal interference in state tax administration -- we can discern no reason why the narrow "remedy at law" exception to each would be different. Indeed, as the above quotation from Waldron illustrates, we ourselves have often used the expression, "plain, speedy, and efficient" interchangeably with "adequate" in the context of the Tax Injunction Act. See also Colonial Pipeline Co., 921 F.2d at 1245 (deciding whether "the state remedy at issue was adequate" under the Tax Injunction Act) (emphasis added); see also Williams, 745 F.2d at 1411 (describing the "plain, speedy, and efficient" analysis as one of whether a remedy is "adequate enough"); see also Town of Ball v. Rapides Parish Police

20

Jury, 597 F.2d 43, 45 n.2 (5th Cir. 1979) (using "plain, speedy, and efficient" synonymously with "adequate").

Although the question of whether a state remedy satisfies the Tax Injunction Act is a federal question, and therefore the district court was not bound by the Georgia Supreme Court's decision, the state's highest court's legal conclusions about state law are "persuasive" authority. Julius v. Johnson, 840 F.2d 1533, 1538 n.2 (11th Cir. 1988). Here, where the focus of the federal issue revolves around the adequacy of a state law, we believe that the Georgia Supreme Court's opinion of its own state's law is entitled to particularly persuasive force.

The district court, nonetheless, rejected the Georgia Supreme Court's opinion, and found that instead of providing a "plain, speedy, and efficient" remedy, O.C.G.A. § 48-5-311 was a "bureaucratic maze" of "delays" and "inadequate relief," and as a result, the appellants "have simply been unable to and will continue to be unable to effectuate a change through the state process." District Court Opinion at 14-15. As such, it held that the taxpayers had no "plain, speedy, and efficient" remedy at state law, and jurisdiction was therefore proper in federal district court. Based on our review of the text of O.C.G.A. § 48-5-311 et seq., the record, and unambiguous case precedent, we disagree.

The district court began its analysis with the "plain" prong, taking notice of the Supreme Court's admonition in Rosewell that "uncertainty concerning a State's remedy may make it less than 'plain' under 28 U.S.C. § 1341." 450 U.S. at 516-17, 101 S. Ct. at 1231 (internal citation and quotation marks omitted). The district court concluded that the remedy was not plain because the plaintiffs could not "challenge the 2000 Tax Digest as non-uniform in its entirety and be assured of an adequate result." District Court Opinion at 21 (emphasis added).

We disagree with the district court's judgment that the state court remedy was not "plain" because it failed to guarantee a county-wide injunction against the tax digest. In the first place, a state remedy need not provide for county-wide injunctive relief in order to be "plain" under the Act. The Supreme Court has held that "at the time that it passed the Tax Injunction Act, Congress was well aware that refund procedures were the sole remedy in many States for unlawfully collecting taxes." Grace Brethren, 457 U.S. at 416, 102 S. Ct. at 2512 (citation omitted). The Supreme Court has also held that "we do not believe that Congress intended federal injunctions and declaratory judgments to disrupt state tax administration when state refund procedures are available." Id. at 417, 102 S. Ct. at 2512. By "state refund procedures" it is clear that the Supreme Court was talking about a remedy whereby an individual taxpayer brings an action to recoup

22

her <u>individual</u> tax payment.  See <u>Rosewell</u>, 450 U.S. at 508, 101 S. Ct. at 1226-27 ("Her only remaining state remedy was to pay the contested tax under protest, and then file . . . a reverse suit for a refund"); <u>Grace Brethren</u>, 457 U.S. at 413-14, 102 S. Ct. at 2510 ("Once a taxpayer has sought from, and been denied a refund by, the appropriate state agency, he may file an action in Superior Court for a refund of the taxes paid" (internal citation omitted)).  It is undisputed that the same sort of refund procedure was available here, and thus the remedy was "plain" regardless of whether county-wide relief was also available.

Indeed, as the Fifth Circuit has held, "[t]here is no indication that Congress intended that the lower federal courts would provide supplemental relief whenever a litigant does not receive all the relief he seeks in state court." <u>Redd v. Lambert</u>, 674 F.2d 1032, 1036 (5th Cir. 1982).  Similarly, in <u>Waldron</u>, a panel of this Court held that the failure of a state remedy to provide <u>class action</u> relief did not prevent it from being "plain, speedy, and efficient," even though the various class members would have to bring all of their individual claims separately.  788 F.2d at 738-39.  In sum, simply because a state remedy does not provide a taxpayer with class-wide or county-wide injunctive relief, it does not follow that the taxpayer does not have an opportunity to raise "any and all constitutional objections to the tax." <u>Rosewell</u>, 450 U.S. at 514, 101 S. Ct. at 1230.

But the district court's analysis of the "plain" prong is erroneous in any event, because a county-wide reassessment is in fact a form of relief available under Georgia state law. O.C.G.A. § 48-5-311 provides:

> If in the course of determining an appeal the county board of equalization finds reason to believe that the property involved in an appeal or the class of property in which is included the property involved in an appeal is not uniformly assessed with other property included in the digest, the board shall request the respective parties to the appeal to present relevant information with respect to that question. If the board determines that uniformity is not present, the board may order the county board of tax assessors to take such action as is necessary to obtain uniformity, except that, when a question of county-wide uniformity is considered by the board, the board may order a partial or total county-wide revaluation only upon a determination by a majority of all the members of the board that the clear and convincing weight of the evidence requires such action. The board of equalization may act pursuant to this paragraph whether or not the appellant has raised the issue of uniformity.

O.C.G.A. § 48-5-311(d)(2). On its face, this statute provides that the taxpayers may raise their county-wide concerns about uniformity to the BOE and the BOE may order county-wide relief.

The district court nevertheless posited four reasons why, under O.C.G.A. § 48-5-311, the taxpayers may not be able obtain "plain" county-wide injunctive relief on their constitutional claims: (1) a citizen's review board such as the BOE

24

is incapable of making the judicial determination contemplated by the Supreme Court in Rosewell; (2) the BOE's power to order a county-wide reassessment is purely discretionary; (3) even if the BOE orders a county-wide reassessment, it is powerless to enforce its order; and (4) a taxpayer would not be able to appeal county-wide claims to superior court if the BOE granted him individual relief.

The district court's first concern is easily dispensed with. As discussed, a taxpayer may appeal rulings of the BOE to Glynn County Superior Court, where he is entitled to de novo review. See O.C.G.A. § 48-5-311(g)(1), (3). The Supreme Court has found state remedies to satisfy the Tax Injunction Act, even where a taxpayer must first exhaust administrative remedies. See Grace Brethren, 457 U.S. at 416 n.35, 102 S. Ct. 2512 n.35 (holding that "nothing in the legislative history of the Act suggests that requiring a taxpayer to seek a refund first through administrative procedures makes the state remedy less than "plain, speedy and efficient"). The fact that taxpayers must first appeal to the BOE before reaching the state superior court is not fatal to the adequacy of the remedy.

The district court's second concern was that the BOE's power to order a county-wide recount is purely discretionary. It based this finding on the statutory language: "[i]f the board determines that uniformity is not present, the board may order the county board of tax assessors to take such action as is necessary to obtain

25

uniformity." O.C.G.A. § 48-5-311(d)(2) (emphasis added). In Noble v. Joint City-County Bd. of Tax Assessors, like in this case, the taxpayers did not allege that their property was overvalued. See 672 F.2d 872 (11th Cir. 1982). Rather, they claimed that the properties of others were undervalued and that they were therefore "forced to pay taxes greater than their proportionate share." Id. at 873. The taxpayers in Noble argued that the state remedy would allow them to challenge only their own valuations and not the system-wide problems. After quoting the exact same statutory language as appears in O.C.G.A. § 48-5-311(d)(2), we said: "[t]he former Fifth Circuit[6] has held that this procedure provides a plain, speedy and efficient remedy to challenge the uniformity of assessments within a county, even in cases like this where the taxpayer does not contend that his property has been incorrectly valued." Id. at 874[7] (citing Adams v. Smith, 568 F.2d 1232 (5th Cir. 1978) (affirming district court on the basis of its opinion reported at 415 F. Supp. 787, 791-92 (N.D.Ga. 1976))). We can find no

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[7] In Colonial, we held that the 1988 amendments to Georgia's ad valorem tax system "so significantly altered the assessment and appeals process," that our prior cases on the subject "remain binding only to the extent to which their underlying premises were left unchanged by the 1988 amendments." 921 F.2d at 1244, 1244 n.11. Since the statutory language discussed in Noble is identical to the current statutory language in O.C.G.A. § 48-5-311, this aspect of Noble remains good law.

support in our caselaw for the suggestion that the word "may" in O.C.G.A. § 48-5-311(d)(2) is too discretionary to provide the taxpayers with a "plain" remedy.

The district court's next concern was that the BOE is powerless to enforce its orders, even when it decides to grant them. As evidence, the district court points out that the Board failed to re-assess all of St. Simons Island and Sea Island, despite an order from the BOE to do so. However, the record reveals that if the Board disobeys the BOE's order, the BOE is free to pursue a mandamus action in court against the Board to enforce its order. For example, in 1997, the BOE of Douglas County, Georgia, ordered its Board to perform a county-wide revaluation of all land in Douglas County, after finding a lack of uniformity. After the Douglas County Board refused to do so, the Douglas County BOE petitioned the Douglas County Superior Court for a writ of mandamus to force the Board to obey its order. Mandamus was promptly granted. See Smith v. Salvo, Case No. 97-CV-618 (Ga. Super. Ct., 1997) (unpublished decision). The superior court found that the Board was "under a clear legal duty to comply with the provisions of the order of the Board of Equalization" and therefore the petitioners were "entitled to the issuance of an Order of Mandamus Absolute compelling [the Board of Assessors] to carry out and complete the county-wide revaluation of land." Id.

As ad valorem taxpayers directly affected by the BOE's order to revalue Glynn County's real property, we see no reason why the appellants in this case would not be able to bring a similar mandamus action in superior court. And since the Board has a "clear legal duty to comply with the provisions of the order" under state law, we can discern no reason why their suit would not be successful. Notably, however, the appellants have never attempted such action. The district court was concerned that "it is most uncertain whether a mandamus action brought by Plaintiffs in Superior Court would meet with dismissal on the basis of [Glynn County]." This, though, misapprehends the Georgia Supreme Court's decision in Glynn County. In that case, as discussed supra, the Georgia Supreme Court found that § 1983 injunctive relief would not lie because "O.C.G.A. § 48-5-311 provides the Glynn County taxpayers with an adequate remedy at law." Glynn County, 543 S.E.2d at 701. In other words, where the taxpayers had failed to attempt the administrative remedies of the statute, they could not attempt to leap-frog those remedies to bring a federal claim directly to superior court. This situation is wholly different. If the taxpayers actually followed the procedures of § 48-5-311 and achieved success before the BOE, and if the Board unlawfully refused to obey the BOE's order, nothing in Glynn County would prevent the taxpayers from petitioning the state superior court to enforce a BOE order they lawfully obtained.

28

In short, if the Board unlawfully disobeys a BOE order, the taxpayers may petition the superior court to enforce that order, and there is absolutely no reason to believe that the Board would (or could) disobey a state court order.[8]

The district court's last concern was that "it is entirely possible that a taxpayer may receive a favorable ruling from the Board of Equalization with respect to an individual property assessment without an order of county-wide revaluation." District Court Opinion at 23. The district court worried that such an outcome might prevent the taxpayer from appealing the county-wide issues to superior court. Moreover, the district court noted that even if the taxpayer could appeal to superior court, "relief may not be granted by the superior court on a county-wide basis because it is unable to enter a declaratory judgment or issue an injunction in light of the [Glynn County] decision." Id.

With respect to the first issue, the statute makes clear that taxpayers may appeal to the BOE "matters of uniformity of assessment of their property with other properties located within such municipality." O.C.G.A. § 48-5-311(e)(1)(B).

_____

[8] The appellants argue in their brief that even if they obtain relief from the BOE or superior court, such relief might not come until after the State Revenue Commissioner has already examined the tax digest and given it final approval. Although this may be true, it does not stand as an obstacle to adequate relief. In the Douglas County case, the BOE did not obtain a mandamus to force a recompilation of the tax digest until after the State Revenue Commissioner had already approved the tax digest. Notwithstanding the State Revenue Commissioner's approval, the tax digest was recompiled pursuant to court order. See R-10, 130 (Testimony of Larry Griggers, Director of Property Tax Division, Georgia Department of Revenue).

Once the taxpayer has raised the uniformity issue with the BOE, the statute explains that if he is unsatisfied with his result, he "may appeal decisions of the county board of equalization . . . to the superior court of the county in which the property lies." O.C.G.A. § 48-5-311(g)(1). Nothing in the state's detailed statute suggests that a taxpayer may only appeal adverse decisions of the BOE with respect to individual assessments, and cannot appeal other adverse decisions. To the contrary, the broad language of the statute allowing the taxpayer to "appeal decisions," without limiting what sorts of decisions, says quite the opposite. We believe the district court's legal conclusion that taxpayers can only appeal rulings on individual valuations is unfounded. Moreover, the district court's finding that a superior court could not grant declaratory or injunctive relief in a properly filed case on the basis of Glynn County misapprehends Glynn County. The Georgia Supreme Court in that case held only that taxpayers could not circumvent the process laid forth in O.C.G.A. § 48-5-311, not that if they properly followed that process, injunctive relief would be denied to them. See Glynn County, 543 S.E.2d at 701.

In short, the four reasons offered for why taxpayers cannot obtain county-wide injunctive relief do not reflect the legal options readily available to the taxpayers under the process set forth in O.C.G.A. § 48-5-311. The taxpayers have

30

simply failed to comprehensively pursue these options. Moreover, we emphasize again that even if county-wide injunctive relief were actually unavailable to the taxpayers under Georgia law, it would still not prevent the state remedy from being "plain" for purposes of the Tax Injunction Act. Supreme Court precedent is unambiguous that a state court remedy may be "plain," even where the sole relief afforded by the state is an individual refund, and such a remedy is undisputedly available here. See Grace Brethren, 457 U.S. at 416, 102 S. Ct. 2512; Rosewell, 450 U.S. at 523, 101 S. Ct. 1234.

Turning to whether the remedy was "speedy" under the Act, the Supreme Court has given only limited guidance as to how "speedy" a remedy must be for purposes of the Tax Injunction Act. In Rosewell, the Supreme Court held that a state remedy procedure that took two years to complete was sufficiently "speedy." See 450 U.S. at 521, 101 S. Ct. at 1233 ("Limiting ourselves to the circumstances of the instant case, we cannot say that respondent's 2-year delay falls outside the boundary of a "speedy" remedy."). The Court explained that "[n]owhere in the Tax Injunction Act did Congress suggest that the remedy must be the speediest." Id. at 520, 101 S. Ct. at 1233. Although the district court suggested that the two-year delay sanctioned in Rosewell was an outer boundary for speediness, the federal courts have rejected such an interpretation. See e.g., Friarton Estates Corp.

31

v. City of New York, 681 F.2d 150, 160 (2d Cir. 1982) ("We do not read the Rosewell decision . . . as setting an outside limit of two years and precluding consideration of special circumstances that may justify further delay."); Long Island Lighting Co. v. Town of Brookhaven, 889 F.2d 428, 433 (2d. Cir. 1989) (delays in excess of twelve years which resulted from delays in state court administration and from the taxpayer's "considerable tactical maneuverings" did not undermine the proscription of Tax Injunction Act); Lerch v. Cascade County Treasurer, 12 F.3d 1107 (9th Cir. 1993) (unpublished table decision) (holding three year delay in state remedy for complex class action to be "speedy" under the Act); Guertin v. City of Eastport, 143 F. Supp. 2d 67, 71 n.3 (D. Me 2001) (two and a half year wait on decision permissible under the Act). Likewise, we do not interpret Rosewell to stand for the proposition that two years is inevitably the outer boundary for speediness, but rather that speediness is a determination that pivots on the underlying facts of the case. See 450 U.S. at 518-521, 101 S. Ct. at 1232-33.

In this case, the state statute itself manifests a strong concern for the speedy adjudication of claims. It requires the taxpayer to file an appeal to the Board within 30 days of the Board's original notice, and requires the Board to decide the appeal within 180 days of receipt of the filing. See O.C.G.A. § 48-5-311(b)(2),

(e)(3). If the Board fails to adjudicate the claim within 180 days (or if it does adjudicate the claim but the taxpayer appeals to the BOE within 21 days), the appeal is automatically forwarded to the BOE. See O.C.G.A. § 48-5-311(e)(2)(C), (3). The BOE itself must schedule a hearing within 15 days of receiving notice of the appeal, and it must conduct that hearing within 20 to 30 days. If the taxpayer wishes to appeal the BOE decision to state superior court, the superior court must hear the case as a bench trial within 40 days, or with a jury at the first term following the filing of the appeal. Simply put, O.C.G.A. § 48-5-311 is comprehensively concerned with the speedy resolution of taxpayer appeals.

Even if two years were an outer boundary, moreover, the district court clearly erred in finding that "[t]he evidence in this case shows that the length of time to resolve a tax appeal on average far exceeds the two-year delay at issue in Rosewell." District Court Opinion at 25. The district court based this finding on an exhibit purporting to list the appeals still pending in the Tax Commissioner's database as of July 25, 2001. The district court said that the exhibit, "shows 404 appeals pending for the years 1992-1999, including 48 appeals from 1994, 172 appeals from 1995, and 81 appeals from 1996."[9] Id. From this, the district court

---

[9]The district court obtained these figures for pending appeals from Record Exhibit 33 and we will accept them for purposes of our discussion. However, we note our concern with their reliability. Florence Dees, Glynn County Tax Commissioner, who compiled Exhibit 33, testified on

33

concluded that the average length of time for an appeal to be completed was more than two years.

The calculations that yielded this average are not altogether apparent from the court's opinion, but it appears as if the district court used only those appeals still pending in 2001 and did not include those appeals that had already been resolved. In other words, the district court's calculation seems based only on a small, biased sample of the aggregate. Without knowing how many appeals were filed in each year and how long those appeals took to be resolved, there is no way of computing the average length of time for appeals. For example, the district court found that as of July 2001, there were 81 appeals still pending from 1996. But the district court made no finding as to how many appeals were originally filed in 1996, nor how many of those appeals were quickly resolved. Perhaps

---

cross-examination as follows:

> Q: So [Exhibit] 33 does not adequately represent the number of pending appeals at any level prior to the year 2000, correct?
> A: It just represents the difference on my system that has not been addressed.

A comprehensive review of her testimony reveals that the 404 supposedly pending appeals were actually 404 appeals that <u>may</u> still have been pending or may also just have erroneously remained on the tax commissioner's system after having already been concluded in one manner or another. Other evidence suggests that a maximum of 293 appeals were still pending at the time. <u>See</u> R-39, Exhibit B, Affidavit of Steve Fentriss. Still other record evidence purports to show that a maximum of 155, pre-2000 cases were still pending at the time. <u>See</u> R-38, Affidavit of Billy Moore.

there were thousands of appeals filed in 1996 and they were all resolved within one year, and only 81, for some reason (here unexplained), remained pending. On this record, we cannot tell. By including only 81 appeals that were still pending in 2001 (i.e., the ones that took the longest to resolve) the district court used an obviously inaccurate method for determining the average length of time for a tax appeal.

Indeed, a review of this record suggests that while at most some 404 appeals were still pending in 2001 from 1992-1999, that figure may be only a small fraction of the total appeals that were already resolved. Steve Fentriss, the Deputy Chief Appraiser for Glynn County, testified that there were as many as 12,395 appeals filed between 1994 and 2000 total. See R-39, Exhibit B, Affidavit of Steve Fentriss. The calculus of an "average" did not account for the thousands of appeals that were timely resolved.

In short, we are not satisfied that the average length of appeal actually exceeded two years, nor that we can answer that question based only on a review of the number of appeals still pending as of 2001. But even if the district court's calculus was accurate, Rosewell did not set two years as the maximum time frame for appeals. Nor did the district court make any findings as to what caused the delays in the appeals it cited. Lastly, and importantly, the appellants have failed to

35

show that they themselves have experienced repeated prolonged delays in the appeals process despite the vigilant pursuit of their claims on their part. Simply put, this record does not establish that the appeals process embodied in O.C.G.A. § 48-5-311 is not "speedy" for purposes of the Tax Injunction Act.

Finally, the district court held that the remedy was not "efficient." A remedy will be deemed "efficient" where it "imposes no unusual hardship . . . requiring ineffectual activity or an unnecessary expenditure of time or energy." Rosewell, 450 U.S. at 518, 101 S. Ct. at 1232. The district court found that the state remedy in this case was not "efficient," because "any adjustment that is made with respect to an individual assessment through the appeal process is effective for only a single year. . . . The taxpayer's only recourse is to file an appeal for each year in hopes of getting relief for that single tax year alone." District Court Opinion at 26-27. However, the Supreme Court explicitly sanctioned this practice in Roswell. In that case, for at least four straight years, the plaintiff appealed her tax valuation to state authorities, and each time, it took the state two years to refund her improper taxes without any interest. See Rosewell, 450 U.S. at 518 n.22, 101 S. Ct. at 1232 n. 22. The Supreme Court found that process to be "efficient." Id. Here, like in Rosewell, the taxpayer has to appeal his yearly valuations on a yearly basis. However, none of the plaintiffs in this case has had

to appeal four years in a row and every taxpayer is entitled to interest on any money the state wrongly keeps while the appeal is pending. In other words, Georgia's system is actually more "efficient" than the system the Supreme Court found to be "efficient" in Rosewell. We are satisfied that the appeals process of O.C.G.A. § 48-5-311 is "efficient" in addition to being "plain," and "speedy" both on its face and as applied to these plaintiffs. Accordingly, this case was barred by the Tax Injunction Act, since it sought a federal court injunction over a state tax assessment where a "plain, speedy, and efficient" remedy existed under state law.[10] See 28 U.S.C. § 1341.

Finally, we note that our holding in this case applies to the application of O.C.G.A. § 48-5-311 in Glynn County in the taxable year 2000. We do not rule out the possibility that other Georgia counties at other times may fail to apply O.C.G.A. § 48-5-311 in a "plain, speedy, and efficient" manner and thus lift the bar to federal jurisdiction. We hold simply, based on our textual review of the Georgia scheme, this record, and case precedent, that the Glynn County tax appeals system both facially and as applied to these plaintiffs was "plain, speedy,

---

[10] Having determined that the appellants had a "plain, speedy, and efficient" remedy under state law, and that the Tax Injunction Act therefore barred their suit, we need not decide whether principles of comity would have dictated a similar result.

and efficient."[11]  Accordingly, we **REVERSE** the district court's order denying the appellee's motion to dismiss, **VACATE** the  district court's order denying class certification and a preliminary injunction, and **REMAND** for further proceedings consistent with this opinion.

**REVERSED IN PART, VACATED IN PART, AND REMANDED**.

---

[11]  Although perhaps unnecessary in light of our broader holding in this case, we also hold that the Rooker-Feldman doctrine bars appellants Haller and Dewhurst from arguing that their remedy was inadequate under the Tax Injunction Act.  Rooker-Feldman provides that federal courts, other than the United States Supreme Court, do not have jurisdiction to review the final judgments of state courts.  See Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S. Ct. 149, 150, 68 L. Ed. 362 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462, 476-82, 103 S. Ct. 1303, 1311-15, 75 L. Ed. 2d 206 (1983).  Rooker-Feldman bars lower federal court jurisdiction where four criteria are met: (1) the party in federal court is the same as the party in state court, see Roe v. Alabama, 43 F.3d 574, 580 (11th Cir. 1995); (2) the prior state court ruling was a final or conclusive judgment on the merits, see David Vincent, Inc. v. Broward County, 200 F.3d 1325, 1332 (11th Cir. 2000); (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding, see Dale v. Moore, 121 F.3d 624, 626 (11th Cir. 1997) (per curiam); and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment, see Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1332 (11th Cir. 2001).

Here, Haller and Dewhurst were indisputably parties to the Georgia Supreme Court's Glynn County decision and that decision resolved the merits of their § 1983 class action suit conclusively.  Moreover, Haller and Dewhurst had ample opportunity to raise their federal claims in state court, and indeed did so, having later obtained review by the Georgia Supreme Court and having had the opportunity to petition the United States Supreme Court for certiorari review had they so chosen.  Finally, as our discussion makes clear, the Georgia Supreme Court adjudicated the central issue in this case in Glynn County, when it held that "O.C.G.A. § 48-5-311 provides the Glynn County taxpayers with an adequate remedy at law."  543 S.E.2d at 701.  We therefore conclude that all four prongs of our Rooker-Feldman analysis have been met and accordingly, Rooker-Feldman barred Haller and Dewhurst from bringing an identical suit in federal court.  Simply put, the district court was without jurisdiction to entertain their claims.  The other seventeen plaintiffs are not barred because they were not parties to the state court suit and therefore do not satisfy the first prong of the analysis.  See Roe, 43 F.3d at 580; Johnson v. De Grandy, 512 U.S. 997, 1005-06, 114 S. Ct. 2647, 2654, 129 L. Ed. 2d 775 (1994)).